[Cite as *State v. Travis*, 2020-Ohio-628.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NOS.  2018-T-0101**<br>**2018-T-0102** |
| HAROLD TRAVIS, JR., | : | |
| Defendant-Appellant. | : | |

Criminal Appeals from the Trumbull County Court of Common Pleas, Case Nos. 2015 CR 00161 and 2016 CR 00580.

Judgment: Affirmed.

*Dennis Watkins,* Trumbull County Prosecutor, and *Ashleigh Musick,* Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*David Cripps* and *Phillip Comorski,* 1300 Broadway Street, Suite 800, Detroit, MI 48226; and *Michael A. Partlow,* 112 South Water Street, Suite C, Kent, OH  44240 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1}    Appellant, Harold Travis, Jr., appeals from the November 9, 2018 Entry on Sentence of the Trumbull County Court of Common Pleas sentencing him to a total term of 36 years imprisonment.  For the reasons that follow, we affirm.

{¶2}    The initial underlying case originated as Case No. 2015 CRA 00405, in which appellant was indicted on five counts: (1) Felonious Assault, a felony of the second

degree, in violation of R.C. 2903.11(A)(1)&(D)(1)(a); (2) Kidnapping, a felony of the first degree, in violation of R.C. 2905.01(A)(1)&(C)(1); (3) Kidnapping, a felony of the first degree, in violation of R.C. 2905.01(A)(3)&(C)(1); (4) Extortion, a felony of the third degree, in violation of R.C. 2905.11(A)(4)&(B); and (5) Having Weapons While Under Disability, a felony of the third degree, in violation of R.C. 2923.13(A)(3)&(B). These events were alleged to have occurred in February 2015 on Elm Road in Warren, Ohio against appellant's wife, Shateara Frank Travis. Appellant pleaded not guilty.

{¶3} While the first case was pending, appellant was charged, in Case No. 2016-CR-580, with three new counts: (1) Felonious Assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1)&(D)(1)(a); (2) Kidnapping, a felony of the first degree, in violation of R.C. 2905.01(A)(3)&(C)(1); and (3) Abduction, a felony of the third degree, in violation of R.C. 2905.02(A)(2)&(C). These events were alleged to have occurred in February 2016 on Douglas Street in Warren, Ohio against Jeremy McMahan and Shannon Johnson. Appellant pleaded not guilty. Appellant's counsel stipulated to the consolidation of the cases for trial and the court journalized the stipulation and consolidated the cases. The counts were ultimately renumbered as one continuous list of charges.

{¶4} The case proceeded to trial, where the jury ultimately found appellant guilty of Count 1, Felonious Assault of Shateara Frank Travis; Count 3, Kidnapping of Shateara Frank Travis; Count 5, Having Weapons While Under Disability; Count 6, Felonious Assault of Jeremy McMahan; Count 7, Kidnapping of Jeremy McMahan; and Count 8, Abduction of Shannon Johnson.

{¶5} The court sentenced appellant to seven years for the Felonious Assault of Shateara and 10 years for the Kidnapping of Shateara, to be served consecutively for a term of 17 years. Additionally, the court sentenced appellant to seven years for the Felonious Assault of Jeremy and 10 years for the Kidnapping of Jeremy, to be served consecutively to each other for a term of 17 years. For the Abduction of Shannon, the court sentenced appellant to a 24-month term. And for Having Weapons Under Disability, the court sentenced appellant to a 24-month term. The two terms of 17 years and the 24-month sentence on the Abduction count are to run consecutively, while the 24-month term for Having Weapons Under Disability is to run concurrently. In all, appellant was sentenced to a total term of imprisonment of 36 years.

{¶6} Appellant filed two notices of appeal, assigned Case Nos. 2018-TR-101 and 2018-TR-102, which this court sua sponte consolidated. He assigns five errors for our review. Appellant's first assignment of error states:

{¶7} The evidence was insufficient to support the convictions against appellant with respect to the kidnapping, felonious assault, having weapons while under disability, and abduction charges.

{¶8} "A 'sufficiency' argument raises a question of law as to whether the prosecution offered some evidence concerning each element of the charged offense." *State v. Swiggett*, 11th Dist. Trumbull No. 2017-T-0003, 2017-Ohio-8203, ¶9, citing *State v. Windle*, 11th Dist. Lake No. 2010-L-0033, 2011-Ohio-4171, ¶25. "'[T]he proper inquiry is, after viewing the evidence most favorably to the prosecution, whether the jury could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Swiggett, supra,* quoting *State v. Troisi*, 179 Ohio App.3d 326, 2008-Ohio-6062, ¶9 (11th Dist.).

3

{¶9} The testimony and evidence presented at trial shows the following facts related to Counts 1 through 5. Nyiesha Frank, the mother of Shateara, testified that appellant and Shateara are married and have one child together, but that their marriage was "rocky," and they had been living apart for some time. Appellant confirmed he and Shateara were not living together at the time of the incidents in question. Around February 14, 2015, Nyiesha was uncharacteristically unable to get in contact with Shateara. Around the same time, she testified that appellant contacted her stating his "bag" was missing and threatened to cut off Shateara's fingers unless Nyiesha produced $5,000. The police were contacted on February 23, 2015, and officers were dispatched to conduct a welfare check at appellant's house on Elm Road. No one answered and the police left.

{¶10} On February 24, 2015, Shateara knocked on the door of Keri Bellay, who let her inside. Ms. Bellay testified that Shateara was crying, panicky, breathing heavily, badly bruised, carrying her infant child, and that neither were properly dressed for the weather. Ms. Bellay called 9-1-1 and handed the phone to Shateara. Ms. Bellay testified that she heard Shateara talk with the 9-1-1 operator; the 9-1-1 call was entered into evidence. Shateara told the operator she was held against her will at her husband's house for approximately two weeks, that he had beaten her up, and that she was able to escape when he left to go to court. The operator asked her why she did not yell out when police conducted the welfare check the day prior, and she stated he threatened her to stay quiet with a gun.

{¶11} The police arrived at Ms. Bellay's residence. Responding officers testified that Shateara was manic and hectic, crying, and had multiple injuries. She provided a

4

statement, in which she reiterated that she was held against her will at her husband's house, that he beat her up, and threatened her and her family with a gun. Shateara was taken away in an ambulance.

{¶12} On February 25, 2015, an arrest warrant was executed at appellant's residence on Elm Road. Appellant was found hiding alone in the upstairs attic and was arrested. The following day, Warren Police executed a search warrant at appellant's residence and found loose and boxed ammunition for handguns and rifles. They also found a loaded, operable shotgun in the attic where appellant was found. Officers also collected a video surveillance system and portable hard drive of the videos. However, the cameras were not synched, did not display accurate dates and times, did not record non-stop, and had various blocks of time missing.

{¶13} Detective Mackey conducted a follow-up interview with Shateara on February 26, 2015, at which time she showed him a conversation between her and appellant on Facebook, in which they discuss their child and the incident in question. Appellant confirmed that was his Facebook account but asserted that other people had his password. The messages appear to show appellant responding to Shateara, "I know I f ***ed up and I know how and I don't know how to make it right," and "trust me, I know what I did and why you feel the [sic] way." When Shateara told appellant she had a cracked rib and concussion, and appellant responded, "I swear it was out of anger and hurt * * * yeah I did all that."

{¶14} Shateara was declared an unavailable witness and her preliminary hearing testimony was read to the jury. At the preliminary hearing, she testified that in February 2015 when she went to drop off an individual at appellant's residence, he approached her

5

with a gun and forced her into the home. She testified that he accused her of stealing money from him, beat her, threatened her and her family, and held her against her will for about two weeks, until she was able to get away.

{¶15} The testimony and evidence presented at trial shows the following facts related to Count 6 through 8. Jeremy McMahan and Shannon Johnson both testified at trial that they were in a relationship in early 2016, and that they were both heroin addicts. Their heroin dealer was appellant's father, Harold Travis, Sr., with whom they resided in exchange for running drugs and errands, and taking care of Harold Travis, Sr., who had limited mobility and other health conditions. It was there that they met appellant. Jeremy and Shannon also visited appellant's home; Jeremy would sometime help by cleaning up after appellant's dogs.

{¶16} At one point, a necklace disappeared from appellant's house. Shannon and Jeremy testified that appellant accused them of stealing it and assaulted Jeremy. When the necklace was found behind a dresser a few days later, appellant apologized and gave them crack and heroin. Later, in July 2016, appellant again accused them of stealing; this time, some of appellant's father's prescription pills were missing. Appellant, and others at appellant's father's house, again assaulted Jeremy. Jeremy was able to flee the residence and called the police. He reported that Shannon was being held against her will at appellant's father's house on Douglas Street. The police arrived removed Shannon, who told them she was afraid of being beaten or killed. Shannon and Jeremy obtained a voucher for a motel but left later that evening to go get food. While driving around town, they encountered appellant and others with him in a white car and were shown a gun and ordered back to appellant's father's house. Shannon, who was driving,

unsuccessfully attempted to evade them. Once at the residence, Jeremy tried to walk away but was forced into the house.

{¶17} Jeremy and Shannon testified that once inside, appellant, his father, and the other individuals began to beat, choke, and prod Jeremy with a screwdriver. Shannon was made to punch Jeremy in the face. In the evening, Jeremy was able to jump through a window and ran to his aunt's house, where he called the police. Around midnight, Warren Police again went to appellant's father's house. They found Shannon in the house, who, upon being assured the officers could ensure her safety, stated she was held against her will. She provided a statement, in which she also confirmed they were forced into the home, and that appellant and others assaulted Jeremy.

{¶18} Appellant took the stand and testified that he was not at his father's house at all on the day in question. However, appellant was under house arrest during the time, and wore an ankle bracelet which sent a radio signal with his location so long as he was within 150 feet of the receiver located at his residence on Elm Road. During July 12 to July 14, 2016, on the dates and around the times Jeremy and Shannon said they encountered appellant, several instances were logged where appellant left his residence without authorization.

{¶19} Additionally, while appellant was in jail, he began talking to a fellow inmate, Joel White. After pleading guilty to unrelated charges, Mr. White contacted the prosecutor's office in July 2018 to provide information he had regarding appellant's pending cases. He stated he received no deals, representations, or promises of leniency in his criminal case in exchange for his cooperation in this matter. Mr. White testified that appellant mentioned he was getting victims to change their statements and lie in order to

7

"beat" his case, and that appellant had Shateara write letters contradicting her original statements. He also testified that appellant admitted to holding Shateara at his house for a couple of weeks, that he "dogged" her a little, which Mr. White understood to mean assaulted her, and that she was leaving the state to avoid being subpoenaed. Mr. White also testified that appellant told him he was charged with "a gun specification" because they found his gun in the attic. Additionally, Mr. White testified that appellant told him he beat Jeremy for stealing prescription pulls and kept him hostage on at least two occasions, but that he had escaped, and that appellant had someone give Jeremy drugs to overdose on.

{¶20} On appeal, appellant argues that while there was some evidence presented to support his convictions, "the evidence as a whole was constitutionally insufficient to prove the essential elements."

{¶21} In addressing his sufficiency argument, we take each of appellant's convictions in turn. First, appellant was convicted of Having Weapons While Under Disability, in violation of R.C. 2923.13, which states:

{¶22} (A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

{¶23} * * *

{¶24} (3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

{¶25} Appellant does not dispute the evidence concerning the underlying elements of this conviction but only disputes the issue of his identity as to the conviction.

8

He argues a rational trier of fact could not have found that appellant was the person who put the gun in the attic, because he asserts that he was not the last person to be seen where the gun was found and that the state presented no evidence that appellant was anywhere near the area where the gun was found.

{¶26} However, the arresting officers testified that appellant was found hiding, alone, in the attic of his own residence. Contrary to appellant's assertion that he was not anywhere near the shotgun, the next day officers found the shotgun within four to five feet of the opening of the attic; it was not hidden or covered and had no dust or dirt on it. Moreover, his fellow inmate testified that appellant admitted to him that police had found his gun. Viewing the evidence most favorably to the prosecution, the jury could have found that it was appellant who as in possession of the shotgun beyond a reasonable doubt.

{¶27} Appellant was also convicted of Kidnapping and Felonious Assault against Shateara and Jeremy, in violation of R.C. 2905.01(A)(3) and R.C. 2903.11(A)(11), respectively.

{¶28} R.C. 2905.01(A) states:

{¶29} (A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

{¶30} * * *

{¶31} (3) To terrorize, or to inflict serious physical harm on the victim or another * * *.

{¶32} R.C. 2903.11(A) states "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *.

9

{¶33} In regard to Shateara, appellant argues that the state did not present any evidence of a purpose to terrorize or inflict serious physical harm, and that there was no evidence of physical harm to Shateara by appellant, since Shateara did not testify at trial and Nyiesha's testimony was hearsay. However, the State presented the testimony of Shateara from the preliminary hearing, in which she identified appellant as her husband and the person who held her against her will and assaulted her. The State also presented the Facebook conversation between Shateara and appellant in which appellant appears to admit he caused Shateara's broken rib and concussion. Additionally, the State offered the medical records from Shateara's hospital visit, which states: "[patient] states held in house and beatten [sic] by husband for past 2 wks * * * states was hit and kicked by husband several times past 2 wks." Pictures of Shateara's injuries were also submitted. From this, the jury could reasonably conclude it was appellant's intent to terrorize or inflict serious physical harm on Shateara, and that he did, in fact, do so. Thus, the State presented sufficient evidence of each of the essential elements of Kidnapping and Felonious Assault against Shateara.

{¶34} In regard to Kidnapping Jeremy, appellant argues the state did not show evidence of a purpose to terrorize or to inflict serious physical harm to Jeremy or restrain him from leaving. And in regard to the Felonious Assault of Jeremy, appellant seems to argue that he could not have "knowingly caused" his injuries because they resulted from the actions of other individuals. However, Jeremy testified that appellant was the one who ordered him and Shannon to return to his father's house by showing them a gun. He stated that once at appellant's father's house, he attempted to walk away but that appellant and the others with him surrounded him and made him go into the house. The

10

prosecutor asked him if he went into the house of his own freewill and he responded "not really * * * I didn't want to." Furthermore, he testified that as soon as he entered the house, appellant and others began to assault him. Shannon also testified that immediately after being forced in the house, appellant and others began to assault Jeremy. Shannon and Jeremy both testified that they tried to get away from appellant and his father's house because they feared being beaten or killed after being accused of stealing from appellant and his father. Furthermore, the State entered pictures of Jeremy's injuries and the medical records from his related hospital visit. The jury could reasonably conclude from this evidence that appellant's intent was to return Jeremy to his father's house in order to terrorize or inflict serious physical harm to him, and that he did, in fact, cause such harm. Thus, there was sufficient evidence of each of the essential elements of Kidnapping and Felonious Assault against Jeremy.

{¶35} Finally, appellant was convicted of the Abduction of Shannon in violation of R.C. 2905.02(A)(2), which states: "[n]o person, without privilege to do so, shall knowingly * * * (2) [b]y force or threat, remove another from the place where the other person is found." Appellant argues that the state did not present any evidence of force or threat, but that the testimony only alleges appellant and others showed them a gun and asked them to follow them back to the residence. However, Jeremy testified:

{¶36} [Jeremy:] I was forced to go back to Douglas Street.

{¶37} [Prosecutor:] How were you forced to go back to Douglas Street?

{¶38} [Jeremy:] They kept going up next to us, showing us guns, and telling us to go to his dad's house.

11

{¶39} Similarly, Shannon testified that appellant was the one holding the gun and told them to go back to the house on Douglas Street. She testified that she tried to outrun them and get away by going down side roads.

{¶40} [Shannon:] They pulled up behind me and I knew that we weren't going to get away. And at that point in time, I—I don't know why I didn't think of it to call the cops or instead drive to the police station like I should have but I followed them.

{¶41} Shannon also testified that once they arrived at the house:

{¶42} [Shannon:] Me and Jeremy reluctantly got out of the car. * * * Harold Travis, Jr., and the other two guys got out of the car and came up front to where we were parked and made sure that we walked inside of the house through the side door.

{¶43} * * *

{¶44} [Prosecutor:] And you did not go back to the house – you did not go into the house voluntarily?

{¶45} [Shannon:] No.

{¶46} By showing a gun and telling them to return to the house, and by not allowing Shannon to evade them, a rational jury could find that appellant forced or threatened Shannon to return to appellant's father's house. Thus, the State presented sufficient evidence of each of the essential elements of the Abduction of Shannon.

{¶47} In light of the foregoing, appellant's first assignment of error is without merit.

{¶48} Appellant's second assignment of error states:

{¶49} Appellant's convictions are against the manifest weight of the evidence.

{¶50} A court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be

12

reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The role of the reviewing court is to engage in a limited weighing of the evidence in determining whether the state properly carried its burden of persuasion. *Id.* at 390. If the evidence is susceptible to more than one interpretation, an appellate court must interpret it in a manner consistent with the verdict. *State v. Banks*, 11th Dist. Ashtabula No. 2003-A-0118, 2005-Ohio-5286, ¶33. "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins, supra,* quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st.Dist. 1983).

{¶51} Appellant argues that the inconsistencies are so numerous that they are impossible to list and that the only evidence linking appellant to the crimes charged was testimony from Shannon and Jeremy, who he purports are not trustworthy, and Joel White, whose motives are suspect.

{¶52} However, as discussed under the first assignment of error, the State presented, contrary to appellant's assertion, evidence of each element of the crime for which appellant was convicted. And after a thorough review of all the evidence, we find appellant's conviction was not against the manifest weight of the evidence.

{¶53} The various inconsistencies that appellant complains of are largely based on the differing testimony of appellant versus the other witnesses. However, it is well established that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Moreover, many inconsistencies were countered by other evidence or testimony. For example, appellant asserted he was not at his father's house

on the day which Jeremy was assaulted. However, his house arrest ankle monitor showed he was not at home without authorization. Additionally, the jury heard a phone conversation between Jeremy and appellant, after appellant had been arrested, in which Jeremy states the police got his testimony wrong and that he didn't say anything against appellant. At trial, however, Jeremy testified that he was lying to appellant on the phone "because [his] life is important to [him]."

{¶54} As for the untrustworthiness of Shannon, Jeremy, and Joel, we reiterate that is a matter for the jury to decide. And in light of the evidence, it was not unreasonable for the jury to believe these witnesses. First, the only criticism appellant makes in support of Shannon and Jeremy's untrustworthiness was that they were drug addicts. However, the use of drugs does not automatically equate to untrustworthiness. Second, the prosecutor and defense counsel thoroughly examined and cross-examined Joel to ascertain his motives. He had signed a plea agreement before contacting the prosecutor about this case. Furthermore, he testified that he was never told by anyone to talk to appellant about his case. He stated that he testified without any promises of leniency in his own case; only that the prosecutor at his own sentencing would say that he cooperated and testified in this case. Instead, Joel testified he began to resent appellant's actions because his brother had recently died of an overdose. Finally, although Joel was in jail on drug related charges, he noted that his drug related activities happened before his brother died and that the drugs were Suboxone, which is intended to help the user get off heroin.

{¶55} Finally, appellant argues that Nyiesha's testimony that appellant was the one who caused Shateara's injuries was hearsay because Shateara did not testify at trial.

14

Contrary to his assertion, however, this was not the only evidence of Shateara's assailant entered into evidence. Any error in this regard is harmless as the state properly entered into evidence Shateara's preliminary hearing testimony, in which she identified appellant as her assailant, and her medical records, in which she states that her husband was her assailant.

{¶56} In light of the foregoing, we cannot say that the jury clearly lost its way in finding appellant guilty; the evidence does not weigh heavily against the convictions. Appellant's second assignment of error is without merit.

{¶57} Appellant's third assignment of error states:

{¶58} The trial court erred by denying appellant's motion for severance of the indictments.

{¶59} At pre-trial in February 2017, the state, appellant, and appellant's counsel discussed consolidation of the two criminal cases for the purposes of trial. Appellant's counsel withdrew and new counsel filed a notice of appearance. New counsel and the state again discussed consolidation of the two criminal cases. On June 12, 2017, appellant's new counsel stipulated to the consolidation, which the court journalized, and the cases were consolidated. Counsel then withdrew, and ultimately new counsel was appointed.

{¶60} In July 2018, appellant filed a Motion for Severance of the two consolidated criminal cases. The state responded noting that discussions regarding consolidation had been occurring with prior counsel since February 2017, over a year earlier. The court denied appellant's motion.

{¶61} Crim.R. 8(A) states that:

{¶62} [t]wo or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the

15

offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

{¶63} Crim.R. 13 allows a court to try two or more indictments together if the offenses could have been joined in a single indictment. Crim.R. 14, however, requires separate trials if it appears that a defendant or the state would be prejudiced by such joinder.

{¶64} A defendant bears "the burden of showing the trial court's refusal to allow separate trials of multiple charges under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial." *State v. Torres*, 66 Ohio St.2d 340, syllabus, (1981).

{¶65} An appellate court reviews a denial of a motion to sever under an abuse of discretion standard. *State v. Stoutamire,* 11th Dist. Trumbull No. 2007-T-0089, 2008-Ohio-2916, ¶52. The phrase "abuse of discretion" is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record. *State v. Ferranto*, 112 Ohio St. 667, 676–678 (1925). "An abuse of discretion may be found when the trial court 'applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.'" *State v. Figueroa*, 11th Dist. Ashtabula No. 2016-A-0034, 2018-Ohio-1453, ¶26, quoting *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720 (8th Dist.).

16

{¶66} "'A prosecutor can use two methods to negate such [defense] claims of prejudice.' First, if one offense could have been introduced under Evid.R. 404(B) at the trial of the other offense, no prejudice could have resulted from joinder. Evid.R. 404(B) recognizes that evidence of other crimes may 'be admissible for * * * proof of motive, opportunity, intent, preparation, plan.' Second, the state can refute prejudice by showing 'that evidence of each of the crimes joined at trial is simple and direct.'" *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶30, quoting *State v. Lott*, 51 Ohio St.3d 160, 163 (1990), and *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991).

{¶67} Appellant argues for the first time on appeal that the charges of kidnapping, abduction and assault were improperly included with gun possession charges. In his motion for relief from prejudicial joinder, made July 18, 2018, appellant argues that the cases should be separated because the events happened over a year apart, the motives appeared to be different, and there were no common victims. He argues the jury would be prejudiced because they would be unable to segregate the evidence. However, no argument was made as to gun possession charges being erroneously joined with kidnapping, abduction, and felonious assault charges. Appellant cannot raise this argument for the first time on appeal; accordingly, we review only for plain error. *See State v. Goodner*, 195 Ohio App.3d 636, 2011-Ohio-5018, ¶35 (2d Dist.). "[P]lain error does not exist unless, but for the error, the outcome of the proceedings would have been different." *State v. Long,* 53 Ohio St.2d 91 (1978), paragraph two of the syllabus. Because the evidence of each charge was strongly supported by the evidence and the evidence presented was simple and direct, as discussed under the second assignment

17

of error and further below, we are not persuaded the outcome would have been different, and thus we find no plain error.

{¶68} Appellant also contends that joinder was improper because the criminal offenses were not of the same or similar character. He notes that the crimes were committed more than a year apart, involved different victims, and occurred at different locations and that "the joinder served only to inflame the jurors' passions." He further asserts joinder effectively denied him the right to a fair and impartial trial because the evidence on each count would not have been admissible under Evid.R. 404(B) to the other counts, if the offenses were tried separately. The State, however, does not argue that as a basis for consolidating the cases. Instead, the state argues that the evidence of each of the crimes joined at trial was simple and direct.

{¶69} The object of simple and direct evidence is to prevent the trier of fact from confusing the offenses or from improperly cumulating evidence of various crimes. *Lott, supra,* at 163-164; *State v. Roberts*, 62 Ohio St.2d 170, 175 (1980). This test "focuses on whether the trier of fact is likely to consider 'evidence of one [offense] as corroborative of the other.'" *State v. Wiles,* 59 Ohio St.3d 71, 77 (1991), citing *Dunaway v. United States*, 205 F.2d 23, 27 (D.C.Cir.1953).

{¶70} Appellant argues that the presentation of different factual situations relating to different counts is complex and will confuse the trier of fact at the defendant's expense. In support, he cites *State v. Van Sickle*, 90 Ohio App.3d 301, 303 (10th Dist.1993) and *Gregory v. United States*, 369 F.2d 185, 186 (D.C.Cir.1966).

{¶71} In *Van Sickle,* the Tenth District found that the gruesome video of the murder victim's burnt corpse, though admissible on the abuse of corpse charge, was more

18

prejudicial than probative on the joined aggravated murder charge. In *Gregory,* the District of Columbia Circuit court found that although the joinder of the claims was proper under Crim.R. 8, it was unfairly prejudicial to the defendant because the evidence as to one of the counts was "so weak as to lead one to question its sufficiency to go to the jury." *Id.* at 189.

{¶72} Neither case is particularly relevant to these proceedings. The evidence of each of the relevant incidents appear to be of similar severity and the evidence of similar weight. Moreover, contrary to appellant's assertion, the fact that the crimes were committed more than a year apart, involved different victims, and occurred at different locations does not show they were not of the same or similar character. To the contrary, in each case, evidence was presented to show appellant accused the victims of stealing from him, forced them to a location they did not want to go to by showing them a gun, and assaulted them. The resulting indictments and convictions on each of these counts included Felonious Assault and Kidnapping or Abduction.

{¶73} The burden is on appellant to show that he was prejudiced by the joinder. He asserts that the evidence of each event was "hardly simple or direct" and that the jury was incapable of segregating the proof required for each offense. We disagree. The different victims, the different locations, and the different times support a finding that the evidence of each crime was simple and direct. Appellant testified at trial in an attempt to refute the evidence presented within each count; while this may have made the evidence within each count less straightforward, the evidence of each count was clear and distinct from the evidence presented to support each other count.

19

{¶74} The State first examined the witnesses who had knowledge about the 2015 incident; then, it examined the witnesses who had knowledge about the 2016 incident. The only deviation was of the three witnesses who testified about both incidents: Ronald Metz, who wrote bail bonds for both cases; Joel White, who met and spoke with appellant while in jail; and Detective Wayne Mackey, who was involved in both investigations. Each witness' testimony was simple and direct. They discussed each of the events separately; they did not go back and forth mixing details involving Shateara with those involving Shannon and Jeremy. They used names or identified people by their relationship to appellant and were not vague in their use of pronouns. And there was a clear "changing of gears" between the testimony of each incident.

{¶75} In light of our finding that the two cases were of a similar nature, and the evidence presented for each was simple and direct, and considering that prior defense counsel stipulated to the joinder of the claims, we find appellant's third assignment of error is without merit.

{¶76} Appellant's fourth assignment of error states:

{¶77} The trial court erred by refusing to allow appellant to represent himself.

{¶78} Appellate courts "review a trial court's denial of a request for self-representation asserted prior to the commencement of trial de novo." *State v. Degenera,* 11th Dist. Trumbull No 2015-T-0104, 2016-Ohio-8514, ¶19.

{¶79} The Ohio Supreme Court has recognized "that the Sixth Amendment "guarantees that a defendant in a state criminal trial has an independent constitutional right of self-representation and that he may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so." *State v. Obermiller,*

20

147 Ohio St.3d 175, 2016-Ohio-1594, ¶28, quoting *State v. Gibson*, 45 Ohio St.2d 366 (1976), paragraph one of the syllabus. "The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta v. California*, 422 U.S. 806, 819 (1975).

{¶80} "A criminal defendant must 'unequivocally and explicitly invoke' the right to self-representation." *Obermiller, supra,* at ¶29. "Additionally, as was recognized in *Faretta*, the trial court must be sure that the criminal defendant 'knowingly and intelligently' forgoes the 'traditional benefits associated with the right to counsel.'" *Id,* at ¶30, quoting *Faretta, supra,* at 835. "Thus, a defendant's unambiguous assertion of the right to self-representation triggers a trial court's duty to conduct the *Faretta* inquiries to establish that the defendant is knowingly and voluntarily waiving his constitutional right to counsel." *Obermiller, supra,* citing *United States v. Cromer*, 389 F.3d 662, 682-683 (6th Cir.2004). "[A] trial judge "must investigate [a defendant's request for self-representation] as long and as thoroughly as the circumstances of the case before him demand." *Obermiller, supra,* at ¶42, quoting *Von Moltke v. Gillies*, 332 U.S. 708, 723-724 (1948).

{¶81} Here, it is not disputed that appellant unequivocally requested to represent himself. Contrary to his assertion that the trial court ignored his request, however, the court made at least three formal attempts to conduct a *Faretta* colloquy and ensure that appellant was "made aware of the dangers and disadvantages of self-representation." *Faretta, supra,* at 835. Appellant refused to cooperate on every occasion.

21

{¶82} On December 11, 2018, a pretrial hearing was held to determine whether appellant understood the consequences of being his own attorney.[1] The following conversation took place, on the record:

{¶83} [The Court:] Do you understand that you have the right to have a lawyer represent you and the Court will appoint a lawyer for you at no cost if you cannot afford an attorney?

{¶84} [Appellant:] Your Honor, how you doing today? How you doing today?

{¶85} [The Court:] I am doing fine. Can you answer my question?

{¶86} [Appellant:] For the record on the record, anything you put on the record I would like to strike them because he's a third-party debt collector. And I feel that you have an interest in this case and –

{¶87} [The Court:] Are you going to answer my question?

{¶88} [Appellant:] Can I talk, please?

{¶89} [The Court:] No, you can't. You have to answer my question.

{¶90} [Appellant:] I want to know how you tolling my speedy time trial? Like, you is violating my rights.

{¶91} [The Court:] Have you thought this matter through and you are certain that you wish to proceed without a lawyer?

{¶92} [Appellant:] Why are you violating my speedy time rights?

{¶93} [The Court:] Do you understand that your current lawyers that you had were experienced and any other attorney that the Court may appoint are experienced in criminal matters and in particular handling criminal jury trials? Do you understand that?

{¶94} [Appellant:] Objection. I don't agree to no trial.

{¶95} [The Court:] Do you understand that --

{¶96} [Appellant:] I'm done talking to you, Your Honor, 'cause you're not --

{¶97} [The Court:] All right. In that case, I'm going to make my ruling that you will not be permitted to be a pro se Defendant in this case. Your

---

1. The court noted that it had previously made an attempt at this on November 20, 2017 but was unable to do so.

22

refusal to answer questions posed to you or your decisions to make other generalized comments --

{¶98} [Appellant:] Objection. You're not allowed to give me legal advice.

{¶99} [The Court:] --makes it understandable to this Court that you are not capable of representing yourself in this case.

{¶100} On February 14, 2018, with new counsel appointed, the court told appellant:

{¶101} [The Court:] You can have [defense counsel] represent you in this case and he is a seasoned attorney who has tried every kind of case imaginable in criminal matters and is one of the best in the entire area. * * * The other option is one that has you defending yourself and he acts as standby counsel. The problem that we've had in the past is in order for you to represent yourself, I am obligated to inquire of you and make a ruling that you're capable of defending yourself. There are questions and there is [sic] procedures as to how that's done and if you answer those questions and they're answered to my satisfaction, I will allow you to represent yourself with [defense counsel] as standby counsel. If one of two things happen; one of which is that you simply don't answer them or if you answer them and I'm not satisfied that you've answered them sufficiently to satisfy this Court and appellate courts that will hear this case afterwards, that you are in a position to adequately represent yourself, then in this situation, [defense counsel] will be your counsel in defense of this case. Do you understand that?

{¶102} * * *

{¶103} [Defense Counsel:] Can I have just one second? * * * I want to ask him if he want to do the Faretta.

{¶104} [The Court:] Yes.

{¶105} [Defense Counsel:] He wants to ask you questions, are you indicating that you want to represent yourself?

{¶106} [Appellant:] I don't feel like I want to answer these questions today.

{¶107} [The Court:] You don't want to answer the questions that I need to ask you in order to make a determination --

{¶108} [Appellant:] Not today, sir.

{¶109} [The Court:] All right.

23

{¶110} Finally, on February 28, 2018, the court again met to conduct a *Faretta* colloquy.

{¶111} [The Court:] * * * We're here this morning in order to ask the Defendant questions to make sure that he understands and that it's a knowing, voluntary decision on his part to be his own counsel, or to be pro se, as they call it. So Mr. Travis, I'm going to ask you some questions. And also for the record, I would note that [defense counsel] is here who has been appointed as standby counsel in this matter. And [defense counsel], it's my understanding that you did have an opportunity to discuss what the issue is as far as the Court entertaining answers to my questions by the Defendant to make sure that he understands the consequences and the parameters of being a pro se attorney.

{¶112} [Defense Counsel:] I did, Your Honor. If I may just sort of fill in where we were from the last time we were here. The Court will recall, I'm sure, that Mr. Travis at that point chose not to answer the Faretta questions. I had written a letter to him basically saying, did you change your mind. When I was here on Monday for another case, I went over to the jail, unfortunately, he hadn't received that letter yet but when I spoke to him, I explained once against that the Judge can't really let you exercise your Faretta rights unless and until he asks you those questions. I believe that Mr. Travis now understands that and I believe that he does want to answer those questions and that's why the Court was kind enough to schedule this hearing.

{¶113} [The Court:] Okay. All right. The first thing I'm going to ask you just generally is why you want to represent yourself, just generally as opposed to having a skilled attorney who handles these things?

{¶114} [Appellant:] Is that the question you to ask me, like --

{¶115} [The Court:] That's the first question.

{¶116} [Appellant:] May I see that question, please? May I see that question, please?

{¶117} [The Court:] It's here. Here. You got it now.

{¶118} [Appellant:] May I see that on paper, please?

{¶119} [The Court:] I can read all of this or none of this. I'm just asking you why you want to be your own attorney?

{¶120} [Appellant:] Because I feel like representing myself.

24

{¶121} [The Court:] You think you can do better than having a skilled criminal trial attorney?

{¶122} [Appellant:] I feel that I represent myself the best.

{¶123} [The Court:] Okay. So that's your main reason?

{¶124} [Appellant:] Yeah. * * * Can I see that question on paper please, Your Honor?

{¶125} [Defense Counsel:] May I have just a second, Your Honor?

{¶126} [The Court:] Yes. These are questions that have been accumulated in order to satisfy certain case law that's come out. They're not verbatim anything from any particular court case. Each Judge does his own. They have to be consistent with what's required by the Supreme Court.

{¶127} After further discussion, in which appellant insists on seeing the questions in writing, the prosecutor further attempted to explain to appellant the *Faretta* case and requirements.

{¶128} [Prosecutor:] * * * Similarly, in this kind of situation, there are questions that the Judge asks of you about the legal process in order to make a determination that you know what you are doing and what you understand your responsibilities are as a person defending themselves or a pro se litigant. And so the Judicial Conference prepared these sample questions for the Judge to look at –

{¶129} [Appellant:] These questions come from the Judicial Conference? May I see these questions?

{¶130} [Defense Counsel:] The point is this, unless you --

{¶131} [Appellant:] I want to see these questions on paper because I will not be judged – this man, the prosecutor, I object -- I'm objecting to him even prosecuting this case, not [the prosecutor]. * * *

{¶132} [The Court:] Do you want to answer my questions?

{¶133} [Appellant:] May I see these questions, please?

{¶134} [The Court:] Answer my question. Are you going to answer my questions?

{¶135} [Appellant:] Yes, I will answer your question once I see these is --

25

{¶136} [The Court:] I'm not showing you this.

{¶137} [Defense Counsel:] He's not required to show them to you.

{¶138} [The Court:] I'm not going to show them to you.

{¶139} [Appellant:] Well, I will --

{¶140} [Defense Counsel:] You can't represent yourself unless you waive your right to counsel and his questions, [the Judge's] questions --

{¶141} [Appellant:] Well, we'll be back next week.

{¶142} [The Court:] We're not coming back next week. He's going to represent you and if you change your mind on the day of the trial --

{¶143} [Appellant:] Objection.

{¶144} [The Court:] -- then that day you will have to answer these.

{¶145} [Appellant:] Objection, Your Honor. Objection.

{¶146} The record is clear that it was appellant's refusal to participate in the *Faretta* colloquies that resulted in the trial court's denial of his request for self-representation. Without the cooperation of appellant, the court was unable to determine that appellant understood the consequences and responsibilities of representing himself. Being unable to ascertain this, as required by law, the court did not err in denying appellant's request to represent himself. Accordingly, appellant's fourth assignment of error is without merit.

{¶147} Appellant's final assignment of error states:

{¶148} The trial court erred by denying appellant's motion for removal of an electronic restraint vest, as it deprived him of the ability to fully communicate with his lawyer during trial without the fear of receiving a debilitating electronic jolt at any time.

{¶149} The general rule is that "'no one should be tried while shackled, absent unusual circumstances.'" *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶104, quoting *State v. Kidder*, 32 Ohio St.3d 279, 285 (1987). "'However, shackling is left to the trial court's sound discretion.'" *Adams, supra,* quoting *State v. Richey*, 64 Ohio St.3d 353,

26

358, (1992). "Courts have upheld restraints in trials of defendants with a documented history of violence or escape attempts. See, e.g., *Harrell v. Israel* (C.A.7, 1982), 672 F.2d 632, 636; *Kennedy v. Cardwell* (C.A.6, 1973), 487 F.2d 101, 105, fn. 5." *Adams*, *supra*. "[A]n appellate court will not disturb the trial court's exercise of its discretion to impose restraints if the record demonstrates 'a compelling need to impose exceptional security procedures.'" *State v. Frazier,* 1st Dist. Hamilton Nos. C-030571 and C-030572, 2004-Ohio-4108, ¶5, quoting *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶82.

{¶150} In *Adams,* the Ohio Supreme Court upheld the use of a stun belt on the defendant during trial. There, the trial court found that the defendant posed a risk of escape, had difficulty in adequately controlling his frustrations and anger, and threatened to punch his attorneys. It also noted that the device was not visible to the jury and unless activated the jury would not know it was being worn.

{¶151} Here, the court conducted a hearing, which does not appear to be part of the record, to determine whether it was necessary for appellant to wear the electronic restraint vest. On October 18, 2018, the court issued a Judgment Entry approving the use of an electronic restraint vest to be worn by appellant under his civilian clothing during trial. The court noted, and the record shows, that appellant had various outbursts and interruptions during hearings on several occasions and did not respond to admonishment; that appellant had threatened correction officers while in jail; and appellant had numerous incidents while at the Trumbull County Jail that resulted in his solitary confinement and ultimate transfer to Mahoning County Jail.

{¶152} Additionally, while arguing that he would wear the vest over his civilian clothing, appellant threatened to spit on the officers and his attorney. The record also

27

shows that prior to trial appellant violated the terms of his house arrest numerous times and had even removed the ankle monitor. After posting bail, he failed to appear for court and was ultimately located by a fugitive recovery team in Georgia.

{¶153} Although appellant blanketly asserts that the vest prevented him from talking with his attorney, he makes no specific references to how this prevented him from talking with his attorney, neither does the record show any such instances. Indeed, it did not deter him from taking the stand and testifying in his own defense.

{¶154} In light of appellant's history of uncooperative attitude, disruptive behavior, destructive actions, and abscosion, the trial court did not abuse its discretion in requiring appellant to wear an electronic restraint vest during trial under his civilian clothing and not visible to the jury.

{¶155} Appellant's fifth assignment of error is without merit.

{¶156} Accordingly, for the reasons set forth herein, the judgment of the Trumbull County Court of Common Pleas is affirmed.

TIMOTHY P. CANNON, P.J.,

THOMAS R. WRIGHT, J.,

concur.

28