[Cite as *State v. Davidson-Dixon*, 2021-Ohio-1485.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                            :

    Plaintiff-Appellee,            :

                                 No. 109557

    v.                             :

DENAYNE DAVIDSON-DIXON,                    :

    Defendant-Appellant.           :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** April 29, 2021

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-645234-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey Maver, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Erika B. Cunliffe, Assistant Public Defender, *for appellant.*

KATHLEEN ANN KEOUGH, P.J.:

{¶ 1} Defendant-appellant, Denayne Davidson-Dixon ("Davidson-Dixon"), appeals his conviction for aggravated assault. Finding merit to the appeal, we reverse and remand for a new trial.

{¶ 2} In November 2019, Davidson-Dixon was named in a two-count indictment charging him with felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1), and domestic violence, a first-degree misdemeanor, in violation of R.C. 2919.25(A). The case proceeded to trial where the jury heard the following testimony and evidence.

{¶ 3} On September 29, 2019, police and EMS responded to a domestic violence call from Davidson-Dixon's wife, Shianne Adams ("Adams"). Once EMS arrived on scene, they found Adams with a small laceration under her blackened eye. Adams complained of pain to her face and teeth. The parties stipulated that Adams sustained serious physical harm — she underwent surgery to repair a closed-fracture orbital bone, closed-fracture of the nasal bond, and a closed-fracture of the left-side of the maxilla. There is no dispute that Davidson-Dixon caused these injuries to his wife. Davidson-Dixon claimed that he caused these injuries because he was acting in self-defense.

{¶ 4} The events leading up to the altercation between Davidson-Dixon and Adams began the night before, when they attended the wedding of Davidson-Dixon's cousin. During the wedding, Davidson-Dixon's family members told him that they observed Adams talking to other men and perhaps getting a telephone number. When Davidson-Dixon confronted Adams, she left the wedding in Davidson-Dixon's car. The two met up at a bar later that night, which was now the early hours of September 29, and they left together to go home. During the drive home, an argument ensued. Adams testified that it was a verbal argument that was

insignificant. Davidson-Dixon testified that Adams was yelling and driving erratically. He said that at one point she smacked and clawed his face. According to Davidson-Dixon, when they arrived home, Adams threw a shot-glass wedding favor at him while he was still seated in the vehicle.

{¶ 5} Sometime later that morning, Adams left the house in Davidson-Dixon's vehicle. She did not arrive back home until approximately 10:00 p.m. after Davidson-Dixon repeatedly texted her to return home with the car. Davidson-Dixon testified that he and his son were watching a movie when Adams entered the house and threw his key-fob at him, hitting him in the face. He stated that he did not confront her about her actions. Adams admitted to tossing the key-fob at him, but stated that she was unsure if it hit him. She stated that she then unplugged the Wi-Fi and went into the bedroom. According to Davidson-Dixon, after Adams threw the key-fob at him, she went into the bedroom, but came back into the living room to unplug the Wi-Fi before going back into the bedroom.

{¶ 6} Adams testified that she was in their bedroom when Davidson-Dixon entered the bedroom and starting yelling at her. She stated that Davidson-Dixon then struck her in the face, causing her to fall and lose unconsciousness. She testified that when she awoke, Davidson-Dixon was standing over her yelling, "yeah, I knocked your b**** a** out." However, Adams told the 911 operator and EMS that she was unconscious for "about ten minutes," and that she "just woke up," and that Davidson-Dixon was sitting in his car a few houses down. Despite telling the 911 operator that she had just woken up after being unconscious for ten minutes,

Adams's phone records indicated that immediately prior to calling EMS, she placed a call to her friend Byron, which lasted approximately ten minutes. When EMS arrived, they transported Adams to South Pointe Hospital where she was treated for her injuries.

{¶ 7} According to Davidson-Dixon, after Adams unplugged the Wi-Fi, he went into the bedroom to ask her why she would do that when she knew that he and his son were watching a movie. He testified that after he told her to pack up her stuff and that he wanted a divorce, Adams punched him in the nose, causing it to bleed. He testified that he pushed her away, and when he looked up, Adams was coming at him with a pair of scissors. Davidson-Dixon testified that out of a reflexive action, he punched her in the face, causing her to fall onto the floor. He stated that Adams got up and immediately placed a call on her phone. Believing that she was calling the police, he took a picture of his bloodied nose, left the house, and drove to the Fourth District Police Station to file a report.

{¶ 8} Davidson-Dixon's interaction with Officer Harris at the Fourth District was video and audio recorded. A portion of the interview was played for the jury. Davidson-Dixon told the officer about what occurred the night before and showed Officer Harris where he sustained injury from Adams clawing at his face. Davidson-Dixon did not show the officer any injury to his eye. Davidson-Dixon then explained that moments before coming down to the Fourth District, he and Adams had an argument, and Adams punched him in the face and bloodied his nose. He then told Officer Harris, "so I hit her back." Upon further questioning, Davidson-Dixon

denied that he "hit" Adams; he stated and demonstrated that he "pushed her — mushed her — get away from me." He told Officer Harris that he did not want to file charges or get her in trouble, but that he was reporting the incident to "cover his a\*\*" because on a prior occasion when he did not report Adams assaulting him, she pressed domestic violence charges against him. Davidson-Dixon denied that Adams suffered any injury as a result of the altercation. At trial, Davidson-Dixon testified that he did not tell Officer Harris about the scissors because he did not want Adams to get into trouble because she was on felony probation.

{¶ 9} At trial, Adams denied that she punched Davidson-Dixon in the face or threatened him with scissors. Davidson-Dixon introduced phone records between the two in which Davidson-Dixon questioned Adams as to why she punched him and threatened him with scissors. In those text messages, Adams did not deny or confirm that she threatened Davidson-Dixon with scissors, but in a subsequent text, she stated that her "little a\*\* punch ain't harm you." Adams told the jury that she has a prior conviction for attempted arson, and that she was currently on probation for felonious assault from when she assaulted Davidson-Dixon's ex-wife.

{¶ 10} During his testimony, Davidson-Dixon testified about a photograph depicting an injury to his eye, which according to him, the injury occurred when Adams came at him with a pair of scissors. However, Teira Miller, Davidson-Dixon's sister, testified that she saw the injury to her brother's eye in the afternoon of September 29, 2019, which was prior to the altercation that occurred later that evening.

{¶ 11} At the close of evidence, Davidson-Dixon requested that the court instruct the jury on self-defense. After considering the arguments raised and the relevant case law, the trial court determined that it would not instruct the jury on self-defense, but would give an instruction on aggravated assault as a "lesser inferior offense."[1] No objection was raised regarding the court's decision to instruct the jury on aggravated assault; Davidson-Dixon objected to the court's decision on self-defense.

{¶ 12} The jury found Davidson-Dixon guilty of aggravated assault, a fourth-degree felony, in violation of R.C. 2903.12(A)(1), the inferior offense of felonious assault; and domestic violence, as charged in the indictment. For sentencing purposes, the court merged the two offenses, and the state elected that the court sentence Davidson-Dixon on Count 1 — aggravated assault. The court imposed a prison sentence of 18 months.

{¶ 13} Davidson-Dixon now appeals, raising two assignments of error.

---

[1]R.C. 2903.12, aggravated assault, adds the mitigating factor of provocation. The trial court used the term "lesser included offense" in the written instructions submitted to the jury when describing the aggravated assault offense. A review of the record and the instructions as a whole reveal that the trial court merely used imprecise language in its written instructions. No argument has been raised on appeal regarding this issue. And we make no determination whether the aggravated assault instruction was warranted based on the record.

## I. Jury Instruction — Self-Defense

{¶ 14} In his first assignment of error, Davidson-Dixon contends that the trial court violated his state and federal constitutional rights to due process and a fair trial by refusing to instruct the jury on self-defense.

{¶ 15} When reviewing a refusal to give a requested jury instruction, an appellate court considers whether the trial court's refusal was an abuse of discretion under the facts and circumstances of the case. *State v. Wolons*, 44 Ohio St.3d 64, 541 N.E.2d 443 (1989).

{¶ 16} Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder. *State v. Stephens*, 2016-Ohio-384, 59 N.E.3d 612, ¶ 17 (8th Dist.), citing *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. Trial courts should ordinarily give a requested jury instruction if it is a correct statement of law, if it is applicable to the facts of the case, and if reasonable minds might reach the conclusion sought by the requested instruction. *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 42 (8th Dist.), citing *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240; *see also Goldfuss v. Davidson*, 79 Ohio St.3d 116, 124, 679 N.E.2d 1099 (1997).

{¶ 17} In this case, Davidson-Dixon requested a jury instruction on the affirmative defense of self-defense pursuant to R.C. 2901.05(B)(1), which now provides:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of

an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, * * * the prosecution must prove beyond a reasonable doubt that the accused did not use the force in self-defense, * * * as the case may be.

{¶ 18} Under R.C. 2901.05(B)(1) there are two burdens. The defendant has the initial burden of production, which is the burden of producing evidence "that tends to support" that the defendant used the force in self-defense. The burden then shifts to the state under its burden of persuasion to prove beyond a reasonable doubt that the defendant did not use the force in self-defense. *State v. Petway*, 2020-Ohio-3848, 156 N.E.3d 467, ¶ 55 (11th Dist.), citing *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31. To satisfy this burden, the state must disprove at least one of the elements of self-defense. *Id.*

{¶ 19} To determine whether the defendant satisfied his burden of production, the court must consider whether the defendant presented sufficient evidence that tends to support that he used force in self-defense. "Placed in context, the phrase 'tends to support' does not connote that a new standard should apply to the determination of whether a defendant is entitled to a self-defense instruction. In order for evidence that 'tends' to support an affirmative defense, it must be sufficient to raise a question in the mind of a reasonable juror, as is already required under the existing standard set forth in [*State v.*] *Melchior*[, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978)]." *State v. Tolle*, 4th Dist. Adams No. 19CA1095, 2020-Ohio-935, ¶ 24.

The proper standard for determining in a criminal case whether a defendant has successfully raised an affirmative defense under R.C. 2901.05 is to inquire whether the defendant has introduced sufficient evidence, which if believed, would raise a question in the minds of reasonable men concerning the existence of such issue.

*Melchior* at paragraph one of the syllabus.

{¶ 20} In deciding whether to give a self-defense instruction, the trial court must view the evidence in favor of the defendant, and the question of credibility is not to be considered. *Jacinto*, 8th Dist. Cuyahoga No. 108944, 2020-Ohio-3722, ¶ 42; *State v. Robinson*, 47 Ohio St.2d 103, 110-113, 351 N.E.2d 88 (1976). If there is conflicting evidence on the issue of self-defense, the instruction must be given to the jury. *Stephens*, 2016-Ohio-384, 59 N.E.3d 612, at ¶ 19, citing *State v. Hill*, 8th Dist. Cuyahoga No. 60736, 1992 Ohio App. LEXIS 3764, 3 (July 16, 1992). However, "if the evidence generates only a mere speculation or possible doubt, the evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted." *Melchior* at 20. Finally, a defendant's bare assertion that he acted in self-defense will be insufficient. *Jacinto* at ¶ 47; *see also State v. Reyes-Figueroa*, 2020-Ohio-4460, 158 N.E.3d 939, ¶ 29 (8th Dist.). His assertions must be coupled with supporting evidence from whatever source and of a nature and quality sufficient to raise reasonable doubt as to guilt. *Melchoir* at 20, citing *Robinson* at 111-112; *see also Jacinto* at ¶ 47.

{¶ 21} Davidson-Dixon requested that the trial court instruct the jury on nondeadly self-defense. To warrant a nondeadly self-defense instruction, Davidson-Dixon must have introduced sufficient evidence tending to support that: (1) he was

not at fault in creating the situation giving rise to the altercation in which the use of force occurred, (2) he had reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent danger of bodily harm, and (3) the only means to protect himself from such danger was the use of force not likely to cause death or great bodily harm, i.e., that he did not use more force than was reasonably necessary to defend against the imminent danger of bodily harm. *See, e.g., Jacinto* at ¶ 43.

### A. Fault in Creating the Situation Giving Rise to the Altercation

{¶ 22} At trial, the state argued that a self-defense instruction was not warranted because Davidson-Dixon caused the situation giving rise to the altercation by going into the marital bedroom to confront Adams. In support, the state cited to *State v. Gaston*, 8th Dist. Cuyahoga No. 98904, 2013-Ohio-2331, where this court upheld the recognized principle that even if the person is not the immediate aggressor, that person cannot provoke an assault or voluntarily enter an encounter and then claim a right of self-defense. The trial court agreed with the state, finding that based on this court's holding in *Gaston*, it would not give the self-defense instruction.[2]

{¶ 23} Our review of *Gaston* reveals that the case is distinguishable. Gaston was playing pool with a friend in an apartment complex and the victim was waiting his turn to play in an adjacent room. An argument ensued between Gaston and

---

[2]It is interesting to note that the trial court found that Davidson-Dixon caused the situation giving rise to the altercation, but then also determined that his actions may have been the result of provocation.

another person, Coleman, about whether the lights should be on or off. Gaston took two pool balls off the table, so that no one could play, and stated that he was going to the security office to resolve the situation. He walked down the hall, but stopped after hearing insults and profanity directed at him. Gaston turned around and rather than continue walking to the security office, challenged the victim to "come say that to my face." Gaston stated that he waited for the victim to approach. Gaston admitted that after the victim ran his body into him, he punched the victim, who fell down. The victim got up and positioned himself in a fighting stance, and Gaston punched him again, causing serious physical harm.

{¶ 24} The *Gaston* trial court refused to give the instruction on self-defense because it determined that Gaston was at fault in creating the confrontation when he took the pool balls from the table. On appeal, Gaston contended that the proper focus should have been who was the first to engage in the physical altercation, not who or what caused the altercation. Gaston argued that because the victim ran his body into him, he had no choice but to defend himself.

{¶ 25} This court held that even viewing the evidence in favor of Gaston, the evidence showed that Gaston was at fault in creating the situation because he took the pool balls off the table, challenged the victim "to come say that to my face," and then waited for the victim to approach him. This court found that Gaston provoked the victim, when he could have continued walking to the security guard station as originally planned. *Id.* at ¶ 17.

{¶ 26} In this case, when Adams arrived home after being away for the entire day, she threw the key-fob at Davidson-Dixon, striking him in the face. She then went into the bedroom. Moments later, she came out of the bedroom and unplugged the Wi-Fi despite seeing Davidson-Dixon and his teenage son watching a movie. Adams then went back into the bedroom. Davidson-Dixon stated that he went into the bedroom to ask Adams about unplugging the Wi-Fi, and an argument ensued where he told her to pack up her things and that he wanted a divorce. Davidson-Dixon testified:

> And no sooner that those words came out of my mouth, she punched me square in the nose[,] so I pushed her. I felt blood coming out of my nose. I touched my nose, seen blood on my hands. As soon as I looked up, she was like literally right in my face coming at me with the scissors. I punched her. Reaction. So the scissors still got me in my eye, she fell on the floor, got up and — got right back up and got on the phone, started dialing. I thought she was calling the police so that's when I pulled out my phone.

(Tr. 300-301.) Davidson-Dixon presented photographs of his bloodied nose and the injury to his eye. In subsequent text messages, Davidson-Dixon asked Adams why she punched him and attacked him with scissors. Although she did not deny or confirm that she threatened him with scissors, she stated in her text message that her "little a** punch ain't harm you."

{¶ 27} Therefore, unlike in *Gaston*, Davidson-Dixon did not create the situation because he did not challenge Adams to engage in fighting activity. We fail to see how Davidson-Dixon created the situation by merely going into the marital bedroom to ask Adams why she unplugged the Wi-Fi. For this court to agree with

the trial court that Davidson-Dixon caused the situation giving rise to the altercation, this court would have to conclude that in a marital home, an unarmed spouse cannot verbally confront the other spouse for the purpose of resolving a dispute without being deemed the aggressor or person who caused the situation. We cannot make that conclusion in this case. Granted, the totality of the circumstances surrounding the confrontation should be considered, i.e., whether the confronting spouse threatens or uses force prior to engaging in the initial confrontation.

{¶ 28} Viewing the evidence in favor of Davidson-Dixon, a reasonable juror could find that Adams was the person who started the altercation. Viewing the evidence in favor of Davidson-Dixon, sufficient evidence was presented that tends to show that Adams caused the situation giving rise to the altercation when she (1) threw the key-fob at Davidson-Dixon's head, striking him; and (2) unplugged the Wi-Fi when Davidson-Dixon and his son were watching a movie; or (3) punched Davidson-Dixon in the face. Accordingly, a reasonable juror could find that Davidson-Dixon was not at fault for creating the situation giving rise to the altercation.

### B. Reasonable and Honest Belief of Imminent Harm

{¶ 29} Viewing the evidence in favor of Davidson-Dixon, he presented sufficient evidence that tends to show that he had reasonable grounds to believe, and an honest belief, that he was in imminent danger of bodily harm. After Davidson-Dixon was struck in the face by Adams, he pushed her away, causing her to fall down. He testified that after he noticed that his nose was bleeding, he looked

up and saw Adams coming at him with a pair of scissors, which he described as having a pointed tip — Adams worked as a cosmetologist. He stated that the scissors poked him in the eye. Davidson-Dixon presented photographs of an injury to the corner of his eye.

{¶ 30} In light of Adams's actions, coupled with the events that occurred the evening before where Adams smacked and clawed him in the face while driving erratically, and then threw a shot-glass wedding favor at him, Davidson-Dixon could have had a reasonable and honest belief that he was in imminent harm when Adams came at him with scissors. Moreover, Davidson-Dixon knew of Adams's criminal history, including a conviction for felonious assault.

{¶ 31} Although Davidson-Dixon did not tell Officer Harris that Adams attacked him with scissors, and his sister testified that she saw the injury to his eye prior to the incident, credibility is not to be considered when deciding whether sufficient evidence is presented to warrant a self-defense instruction. *See Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, at ¶ 42. Davidson-Dixon's testimony, if believed, is sufficient evidence that tends to show that he had reasonable grounds to believe that he was in imminent danger of bodily harm.

### C. Reasonable Force

{¶ 32} It is undisputed that Davidson-Dixon threw a single punch. This court has repeatedly held that a single punch, even if it causes serious physical harm or death, is nondeadly force. *Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 43, fn. 2, citing *State v. Triplett*, 192 Ohio App.3d 600, 2011-Ohio-816, 949 N.E.2d 1058, ¶ 14

(8th Dist.) (one punch is not "comparable to deadly force"); *State v. Redding*, 3d Dist. Union No. 14-19-01, 2019-Ohio-5302, ¶ 19, quoting *State v. Jeffers*, 11th Dist. Lake No. 2007-L-011, 2008-Ohio-1894, ¶ 81 ("'A single punch, standing alone, may not constitute deadly force.'"). And even if Davidson-Dixon could have left the bedroom after being punched in the face and threatened with scissors, there is no duty to retreat to avoid the danger in cases involving the use of nondeadly force, even if retreat is possible. *Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 1125, ¶ 19 (8th Dist.).

{¶ 33} According to Davidson-Dixon, it was a reactive punch when he looked up and saw the victim in his face with scissors. Considering pointed-tip scissors could be deemed a deadly weapon, a single punch could be reasonable force. In subsequent text messages, Davidson-Dixon asked Adams why she punched him and attacked him with scissors. Although she did not deny or confirm that she threatened him with scissors, she stated in her text message that her "little a** punch ain't harm you." She denied at trial both hitting him and threatening him with scissors. Again, credibility is not to be considered, but where conflicting evidence is presented, the instruction should be given. *Stephens*, 2016-Ohio-384, 59 N.E.3d 612, at ¶ 19.

{¶ 34} Accordingly, viewing the evidence in favor of Davidson-Dixon, he presented sufficient evidence that tends to show that he used reasonable force to defend against imminent danger of bodily harm.

## II. Conclusion

{¶ 35} The trial court found that the evidence presented was sufficient to warrant an instruction on the inferior offense of aggravated assault, which adds the mitigating element of provocation — that Davidson-Dixon's actions were influenced by sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by Adams. The jury found Davidson-Dixon guilty of the inferior offense of aggravated assault; thus, the jury believed that Adams provoked Davidson-Dixon causing him to strike her. Based on the verdict, this court assumes that the jury did not entirely believe Adams because, according to her testimony, she did nothing to provoke Davidson-Dixon: (1) she did not know if she struck him with the key-fob; (2) she never punched Davidson-Dixon; (3) she never came at him with scissors, and (4) Davidson-Dixon entered the bedroom yelling and immediately struck her in the face. And if the jury believed that Adams's action of coming at Davidson-Dixon with scissors was the event that provoked him, then a reasonable juror could conclude that a single punch could be reasonable force, such that a nondeadly force instruction should have been given.

{¶ 36} Whether the state disproves any of the elements of self-defense is left to the trier of fact to decide. *See, e.g., State v. Morton*, 147 Ohio App.3d 43, 2002-Ohio-813, 768 N.E.2d 730, ¶ 52 (8th Dist.). In this case, the trier of fact was the jury, not the trial judge. The trial court improperly assumed the jury's role by making its own evaluation of the weight of the evidence and the credibility of the witnesses in deciding not to give the self-defense instruction. Based on the record before this

court, we find that when viewing the evidence in favor of Davidson-Dixon, sufficient evidence was presented that tends to show that he acted in self-defense. The trial court should have granted Davidson-Dixon's request to instruct the jury on non-deadly self-defense. The first assignment of error is sustained

{¶ 37} Having sustained the first assignment of error, Davidson-Dixon's second assignment of error challenging the effectiveness of his trial counsel is rendered moot.

{¶ 38} Judgment reversed; case remanded for a new trial.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
EMANUELLA D. GROVES, J., CONCUR