[Cite as *State v. Jordan*, 2022-Ohio-2566.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-210603 |
| | | TRIAL NO. B-2000676 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| STANLEY JORDAN, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 27, 2022

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Ron Springman* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy McKenna,* for Defendant-Appellant.

**BOCK, Judge.**

**{¶1}** Defendant-appellant Stanley Jordan appeals his convictions of felonious assault and murder, arguing that the trial court should have severed the counts of murder from the counts of felonious assault, the convictions were based on insufficient evidence and were against the manifest weight of the evidence, and he was denied the effective assistance of counsel.

## I.    FACTS AND PROCEDURE

**{¶2}** Jordan was indicted on two counts of murder in violation of R.C. 2903.02(A) and (B), and two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2). The state alleged that Jordan murdered Kenneth Bradley at Bradley's home by stabbing him with a knife. Further, the state alleged that the following morning, Jordan stabbed Ocie Cutts, causing serious injury.

**{¶3}** Jordan moved to have counts 1 and 2, the counts involving Bradley, severed from counts 3 and 4, the counts involving Cutts. Jordan argued that the jury would not be able to separate the evidence for each incident, which would be prejudicial to Jordan. The trial court denied the motion, stating that appropriate jury instructions would be given to prevent any prejudice.

### A. The Trial

1. Kenneth Bradley's murder

a)    *Jordan, his girlfriend, and Bradley were together at Bradley's house*

**{¶4}** Bradley's friend, Todd Rutledge, testified that on January 26, 2020, he and Bradley had finished work around 10:00 p.m. Bradley asked Rutledge to take him to Murray's Pub to meet friends. Bradley's friends, Jordan and Jordan's girlfriend,

Crystal Criswell, were across the street at a bar previously known as the Golden Nugget, so they went there instead. After a while at the bar, Bradley asked Rutledge if he wanted to go to Bradley's house with him, Jordan, and Criswell, but Rutledge declined. The trio left the club before Rutledge.

{¶5} Criswell testified that she, Jordan, and Bradley had been drinking at the Golden Nugget when they decided to go to Bradley's house, stopping at United Dairy Farmers on the way. The group arrived at Bradley's house, parked in the back yard, and went in through the front door. Criswell testified that Bradley had taken off his brown coveralls and was wearing an all-black hoodie-type shirt and all-black pants. She was initially certain that Bradley was not wearing the clothing shown in the picture of his body lying on the floor, but later testified that "it looked all black to me," and if "he did have on camo pants they looked black to me."

{¶6} Criswell testified that she started feeling sick around 11:00 p.m., so she told Jordan she was ready to leave. When the two left, Bradley came outside behind them, asking why they were leaving. Criswell told Bradley that she was tired, and then she and Jordan got into Jordan's car.

b) *Bradley and Jordan fight*

{¶7} Criswell testified that she and Jordan were sitting in the car for about two minutes before Jordan began to throw up. Bradley came outside to the passenger side of the car to ask Criswell if she had seen his cigarettes. Criswell responded that she could not find them. Bradley went back into the house, but came back outside to the driver's side where Jordan was seated and asked Jordan if he had seen the cigarettes. Jordan responded that he had not seen the cigarettes. Bradley began to search the floor of the back seats.

3

{¶8} Criswell testified that Jordan had become "frustrated, or whatever," and "[a]ll of a sudden, he gets out the car and they start fighting." Criswell heard Jordan tell Bradley "n****, I'll kill you." Criswell yelled at them to stop fighting, but they continued "grabbing each other, hemming each other up," and that they "tussled" all around the car, causing it to rock. Criswell said that the fight lasted about four to five minutes before she saw Bradley "dart out" and run "funny" into the house. Criswell testified that Jordan told her "it's blood" and he flung something white from his hands. Criswell asked Jordan if he had been shot or otherwise hurt, but Jordan said that he was fine. She did not see a knife.

{¶9} Criswell testified that Bradley was sitting "like, slumped" on the porch looking at her and Jordan as they pulled off. Jordan called her the next day to tell her that Bradley was dead and someone must have killed him after they had left. Criswell testified that she did not believe that someone else had killed Bradley. Jordan called Criswell nearly every day of that week from different phone numbers, telling her not to talk to police. Criswell testified that she was concerned that she would be implicated, so she spoke to Detective Sieving. Criswell stated that she was afraid of Jordan because he kept calling her.

c) *An eyewitness testified that he saw person with a knife*

{¶10} David Collins testified that he lived with his brother about two houses away from Bradley's, and that his friend, Jason, lived at the top of the hill. Collins only "knew of" Bradley, as they were neighbors and Collins had previously taken one of Bradley's trash cans, resulting in an "incident."

{¶11} Collins testified that he and his brother had gotten into an argument, so he took a walk. He walked "a little trail" and noticed a vehicle, which matched the

description of Jordan's vehicle, parked to his right with the lights on. Collins stated that, as he walked "back around up the trail to come back through the church parking lot, he walk[ed] up [his] street and heard a woman say 'Don't worry about it, he is not the police.' " Collins said that he responded that "'if he were the police" then she "would be locked up by now" and proceeded to Jason's house to talk about Jordan's vehicle. Collins heard the female's voice from inside the car tell "him" to get out of the car, then "no, stop, stop, stop," as he saw Bradley get out of the back passenger side of the car and start running. Collins testified that the driver, who had "long dreads," was holding what "appear[ed] to be a knife" as he chased Bradley. Collins knew the passenger was Bradley as they were neighbors.

{¶12} Collins testified that he watched "all the way up until they came to [Bradley's] porch area," which he could not see from where he was standing, and then he went into his house. He later told Bradley's family what he saw, and they conveyed that information to detectives.

d) *Police investigated Bradley's murder*

{¶13} Bradley's sister, Michelle Ford, was concerned on the morning of January 27, 2020, because she had not heard from Bradley since the previous night. The two usually spoke a few times each day. She went to Bradley's house and saw that the gate was open—normally, Bradley kept the gate closed. Ford saw drops of blood going up the steps and in the seat where Bradley usually sat on the porch. She went through the open door of Bradley's home to find his body lying on the floor in a pool of blood. Ford called 911. Ford testified that Bradley would leave the back door open only for certain people, such as her.

5

{¶14} Officer Amanda Bridewell was the first officer on the scene. She observed a pool of blood outside of Bradley's home that continued into the house. She saw a puddle of blood at the base of the steps that went into the front door of the house, blood on the porch furniture, and Bradley's body lying in the front middle of the room in a pool of blood. She testified that the blood trail also went between the fence line that went up to the residence.

{¶15} Officer Kathy Newsom, a 24-year Cincinnati officer with the homicide/criminalistics unit, testified that the blood trail on Bradley's property went from the back of the house, to the front door, and into the house. She explained that she knew the blood was dripping while Bradley was moving based on the "spines" of the blood drops, which indicated that the blood trail was going in one direction. Newsom testified that all of the blood collected at the scene belonged to Bradley. A forensic scientist with the Hamilton County coroner's office also testified regarding the process for testing blood samples and that the DNA tested belonged to Bradley.

{¶16} Dr. Karen Looman, chief deputy coroner, provided expert testimony about Bradley's stab wound. She stated that the stab wound to Bradley's heart was consistent with a pocketknife. Moreover, a number of defensive wounds were consistent with a knife. Dr. Looman testified that a stab to the heart does not cause instantaneous death because the wound through the heart is not what kills a person. The blood would first leak into the protective sac around the heart versus squirting out. Dr. Looman stated that someone can be stabbed in the heart and still walk several blocks, depending on how fast their heart is beating and how fast the blood is leaking. She said that a person can live for about five to 15 minutes before bleeding out and dying.

{¶17} Dr. Looman testified that the blood trail at Bradley's house was consistent with a stabbing. She testified that no blood was found in the back yard or the grassy area. Rather, the blood started at the back door and the blood oozed out, soaking his shirt and pants first before drops began to hit the ground. She stated that very little blood would be on the attacker due to how it leaks.

{¶18} Dr. Looman explained that rigor mortis sets in between 12 and 24 hours postmortem and any blood left in the body would settle in place, though it shifts if the body shifts. Bradley's body was stiff and cold upon its discovery, but his blood was still shifting, which indicated to her that it had been eight to ten hours since his death. Dr. Looman testified that, while science cannot dictate an exact time of death, Bradley died closer to the last time when he was seen alive than when he was discovered around 8:14 a.m the next day; his body temperature and rigor mortis indicated that he had been deceased "several hours."

{¶19} Officer Sandy Sieving, with the Cincinnati Police Department's homicide division, interviewed Collins. Collins told her what he saw and heard on the night of Bradley's death and showed her where he was standing while he was watching. Sieving testified that the bamboo did not obstruct Collins's view of what he witnessed as there were no leaves on the tree or brush in that area.

### 2. Ocie Cutts's Assault

{¶20} Theresa Ballew testified that she and Jordan share two children. She requires Jordan to call in advance if he wants to see them. On the morning of January 27, 2020, Jordan called her repeatedly saying that he needed to talk to her. Ballew and her significant other, Ocie Cutts, had left the house to get food. Jordan was at her house

when they returned. Jordan asked to use her bathroom. Ballew allowed him to use the bathroom, which made Cutts angry and prompted him to leave.

{¶21} Ballew testified that Jordan had come down the stairs from the restroom around the time that Cutts returned. As Ballew was opening the door to allow Jordan to leave, Cutts pushed the door open with no force. Cutts and Jordan "started tussling with each other." Ballew testified that she heard Jordan say, "n**** I['ll] kill you." Ballew stated that, "The next thing I know, he said, he got me * * * he cut me." Ballew later got a call informing her that Cutts was in the hospital.

{¶22} Ballew testified that Jordan had to do something to protect himself, but also testified that she felt the same about Cutts. She further testified that "you have to do something to protect yourself if somebody hurting you. Not saying you got to protect yourself with a weapon * * * but to get someone off of you * * *."

{¶23} D.A., Ballew's 15-year-old son, was at home the morning of the assault. He testified that his mother had asked him to see what Jordan was doing in the bathroom. When he looked through the open door of the bathroom, D.A. saw Jordan washing off a silver-grayish folding pocketknife in the sink. D.A. testified that Jordan shut the blade and went downstairs. D.A. stated that Cutts started arguing with Jordan and grabbed Jordan first, with his hands around Jordan's throat, "trying to choke him." D.A. attempted to break up the fight, but the men "kept charging each other." D.A. heard Cutts say, "he got me." D.A. saw blood on Cutts. He did not see the knife in Jordan's hand or see it go into Cutts's body as the men were close to each other; he just saw the blood afterward.

{¶24} Cutts testified that he left the house to help a friend, not because he was angry that Jordan was there. Cutts said that when he returned to Ballew's house, he

asked Jordan why he kept coming around bothering Ballew. Jordan said "f*** you, n**** I'll kill you" and began to walk toward Cutts with his hands in his jacket pockets. Cutts stated that he made contact first, grabbing Jordan by the shoulders to prevent an "aggressive" looking Jordan from grabbing him. Cutts denied ever putting his hands around Jordan's neck.

{¶25} After being stabbed, Cutts left in his car. He felt like he was going to pass out, so he flagged down two detectives who took him to the hospital. He remained hospitalized for weeks to treat his five lacerations. He had a chest tube and a blood transfusion, and his spleen was removed. Cutts testified that he is now susceptible to disease, he cannot stand long, can no longer work as a forklift operator, and cannot find work.

{¶26} Around four days after Cutts was stabbed, Officer Sieving brought Jordan in for questioning. Sieving testified that she did not observe any marks or other injuries to Jordan's face and neck, nor did he complain that he had any injuries.

{¶27} Jordan presented no witnesses. He moved for a Crim.R. 29 acquittal at the close of the trial, which the court denied. While Jordan previously had sought severance of the counts, he did not raise the issue of severance after the state's case.

## B. **The Jury's Verdict and Sentence**

{¶28} The trial court gave specific instructions about each charge. It cautioned the jury to consider the counts separately as the charges "constitute[d] a separate and distinct matter," the jury "must consider the matters applicable to each count separately," and that it "must be uninfluenced by each verdict and by any other count."

{¶29} The jury found Jordan guilty of one of the two murder counts and both counts of felonious assault.

{¶30} Jordan moved for an acquittal under Crim.R. 29(C). The trial court denied the motion, finding that there was no indication that the jury did not follow the instructions to consider the charges separately. The trial court addressed inconsistencies in Criswell's testimony, stating that the jury observed her testimony and demeanor and assessed her credibility. The court found that, given the amount of time that had passed since the murder, Criswell was "quite clear" and that "fully justified the jury's verdict."

{¶31} The trial court stated that there was no dispute that Jordan was at Bradley's house and there was tussling. The court found it "strange" that D.A. saw Jordan washing a knife in the bathroom of a house in which he does not live and that D.A.'s testimony was credible. The court stated that it would not "invade the province of the jury on what testimony is credible," and that it found that the evidence was "adequate and the jury's findings are appropriate on the murder conviction."

{¶32} The court stated that Jordan's strongest argument was the self-defense argument because there was a "direct contradiction in the testimony between two of the witnesses" and that Cutts was not credible. But the court found that the jury's verdicts were supported because of the "extent of injuries to Mr. Cutts under the circumstances and the magnitude of the force used would exceed what is reasonable." The court denied Jordan's motion for an acquittal and ordered a presentence investigation and victim-impact statement.

{¶33} At sentencing, the court merged the felonious-assault counts and sentenced Jordan to three years on the assault, to run concurrently with the 15 years-to-life sentence for the murder conviction.

## II.    LAW AND ANALYSIS

### A. **The trial court properly tried the counts together**

**{¶34}** In his first assignment of error, Jordan asserts that the trial court erred by trying the murder counts with the felonious-assault counts.

**{¶35}** An appellate court reviews a denial of a motion to sever under an abuse-of-discretion standard. *State v. Travis*, 11th Dist. Trumbull Nos. 2018-T-01010 and 2018-T-0102, 2020-Ohio-628, ¶ 65. The phrase "abuse of discretion" is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record. *Id.* "An abuse of discretion may be found when the trial court 'applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.' " *Id.,* quoting *State v. Figueroa*, 2018-Ohio-1453, 110 N.E.3d 612, ¶ 26 (11th Dist.), quoting *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454 (8th Dist.).

**{¶36}** Under Crim.R. 8(A), two or more offenses may be charged in the same indictment if the offenses charged are (1) of "the same or similar character," (2) "based on the same act or transaction," (3) "based on two or more acts or transactions connected together or constituting parts of a common scheme or plan," or (4) "part of a course of criminal conduct." *State v. Allen*, 1st Dist. Hamilton Nos. C-050010 and C-050011, 2006-Ohio-2338, ¶ 18. The law favors joining multiple criminal offenses in a single trial; joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, diminish inconvenience to the witnesses, and avoid delays in bringing the accused to trial. *Allen* at ¶ 18; *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 18, quoting *State v. Franklin*, 62 Ohio St.3d 118, 122, 580 N.E.2d 1 (1991). Under Crim.R. 13, "[t]he court

may order two or more indictments or informations or both to be tried together, if the offenses * * * could have been joined in a single indictment or information." *Gordon* at ¶ 18.

**{¶37}** Crim.R. 14 requires separate trials if it appears that a criminal defendant would be prejudiced by joinder. *Id.* at ¶ 13. To prevail, defendants must affirmatively demonstrate that (1) their rights were prejudiced by the failure to sever, (2) they provided the court with sufficient information to allow it to weigh the benefits of joinder against their right to a fair trial, and (3) the trial court abused its discretion by refusing to sever the charges for trial given the information it had been provided. *Allen* at ¶ 19.

**{¶38}** A reviewing court will conclude that joinder was not prejudicial if it makes one of two determinations. *State v. Rosemond*, 2019-Ohio-5356, 150 N.E.3d 563, ¶ 15 (1st Dist.). The first, known as the "other acts test," may negate prejudice from joinder if the state could have introduced evidence of one offense in a separate trial of another offense under the other-acts provision of Evid.R. 404(B). *Id.* The second determination, known as the "joinder test," requires only a showing that the evidence of each of the joined offenses is "simple and distinct." *Id.* This court stated:

> [t]he object of the "simple and distinct" test is to prevent the jury from improperly considering evidence of various crimes as corroborative of each other. "[T]he very essence of this rule is that the evidence be such that the jury is unlikely to be confused by it or misuse it." Generally, under the simple-and-distinct test, if the evidence of each offense is direct and uncomplicated, it is presumed that the trier of fact is capable

of segregating the proof and not cumulating evidence of the various
offenses being tried.

(Citations omitted.) *State v. Echols*, 128 Ohio App.3d 677, 694, 716 N.E.2d 728 (1st Dist.1998).

{¶39} Jordan argues that the failure to sever the counts made it "very easy for the jury to improperly and impermissibly conclude that since [he] had a knife at the felonious assault incident, he must have had a knife at the murder scene," and that the two incidents shared no common scheme, nor were they connected. He contends that the joinder of the cases was prejudicial as there were "no 'other acts' necessary to provide a complete picture of the incident." Jordan further argues that there was a self-defense issue as to the felonious assaults.

{¶40} While Jordan moved to sever at least twice throughout the course of the proceedings, he failed to renew the motion at the close of his case. Therefore, this court reviews this claim for plain error under Crim.R. 52(B). *Rosemond* at ¶ 15. To prevail on a claim of plain error, an accused must show that an error occurred, that the error was plain, and that the error affected the outcome of the trial. *See* Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). An appellant must demonstrate a reasonable probability that the error resulted in prejudice. *See State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. "[P]lain error does not exist unless, but for the error, the outcome of the proceedings would have been different." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶41} There is no error, much less plain error. Bradley died from a stab wound. The very next morning, D.A. saw Jordan washing a pocketknife off in Ballew's

restroom shortly before Jordan used a knife to stab Cutts. D.A.'s testimony connected the two crimes, making it permissible to try the two together under Crim.R. 8(A).

{¶42} Moreover, Jordan cannot show under Crim.R. 14 that the trial court was required to hold separate trials. Jordan was not prejudiced by trying the counts together. The evidence was simple and, other than D.A.'s testimony involving Jordan cleaning the knife, the evidence was distinct.

{¶43} Criswell testified that she heard Jordan tell Bradley that he would kill him, saw Jordan "tussling" with Bradley, and heard Jordan say "it's blood" and throw something to the ground. Collins said he saw someone matching Jordan's description chase Bradley with a knife. The medical expert testimony reflected that the stabbing would not cause instantaneous death; instead, the victim could have walked around, dripping blood. The testimony and forensic evidence are consistent with Bradley being stabbed near Jordan's car, walking around to the front of the house, stopping at a gate, and sitting on the porch where Criswell testified that she saw him as she and Jordan drove away. An expert witness testified that the stab wound was consistent with a pocketknife.

{¶44} This evidence is simple and distinct from that used to prove Jordan's guilt on the felonious-assault charge. Jordan did not deny that he stabbed Cutts. Instead, he argues on appeal that it was in self-defense. Ballew, D.A., and Cutts all testified about the interactions between the two men before they began fighting. Cutts testified about his serious injuries stemming from Jordan stabbing him.

{¶45} The trial court found no indication that the jury did not follow instructions to consider the charges separately. We agree. In fact, the jury found Jordan not guilty on one of the counts of murder, therefore distinguishing between

Jordan purposefully causing Bradley's death (not guilty) and Jordan causing Bradley's death as a product of the assault (guilty). Each conviction was supported by the evidence. As the outcome of the proceedings likely would not have been different had the court severed the counts, and the evidence presented was simple and direct, there is no plain error. We overrule Jordan's first assignment of error.

## B. **The convictions were supported by sufficient evidence**

{¶46} Jordan's second assignment of error asserts that his murder conviction was based on insufficient evidence. The test for determining the sufficiency of the evidence is whether "after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State v. MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, ¶ 12, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Sufficiency is a question of law for the court to determine and this court is not to weigh the evidence unless, after viewing the evidence, it weighs heavily against conviction. *MacDonald* at ¶ 12.

### 1. The evidence was sufficient to support the murder conviction

{¶47} Jordan argues that the state did not prove each element of murder because there were no eyewitnesses or evidence to identify the killer, Bradley was found in clothing that was different from what Criswell described him wearing when she and Jordan left Bradley's house, and Bradley was his friend.

{¶48} Criswell testified that she was yelling for the men to stop fighting, and then she saw Bradley "dart out" and "run funny" after the fight had ended. Jordan then said, "it's blood," causing her to think that Jordan was injured. Criswell testified that

15

Bradley was sitting, "like, slumped" on the porch. Jordan called Criswell repeatedly over the course of a week telling her not to talk to the police.

{¶49} The evidence involving blood supported the conclusion that Bradley was stabbed near Jordan's car. Experts testified that Bradley was able to walk for five to 15 minutes after being stabbed, which explains the blood trail from where Jordan and Bradley fought to where Bradley died inside the house. It also explains the blood in the chair where Bradley sat, slumped, as Jordan and Criswell left.

{¶50} Jordan asserts that Criswell's testimony as to what Bradley was wearing proves that Bradley was murdered by someone else. But Criswell testified that she was intoxicated the night of the murder. She said that the clothing "looked like all black to me" and "if he did have on camo pants they looked black to me." Bradley was found in a black hoodie with different colors on it, a long-sleeved green shirt, and white-patterned pants under dark green camouflaged pants. Criswell's testimony about his clothing was not so inconsistent as to render the verdict unsupported by sufficient evidence.

{¶51} Moreover, while Jordan argues that there was no evidence to identify Bradley's killer, Collins described a man with long dreadlocks. Jordan had long dreadlocks. Collins' testimony corroborated Criswell's testimony that Jordan and Bradley were in an altercation. Collins saw a man with long dreads chasing Bradley around the yard with a knife. Collins heard a woman in the car yelling "stop, stop, stop," which is corroborated by Criswell's testimony. Sieving's testimony reflected that Collin's view of the chase was unobstructed by the bamboo or other vegetation.

{¶52} The state provided sufficient evidence that Jordan murdered Bradley.

2. The state showed an absence of self-defense

**{¶53}** To establish self-defense, defendants have the initial burden of producing evidence that tends to support that they used force in self-defense. *State v. Davidson-Dixon*, 2021-Ohio-1485, 170 N.E.3d 557, ¶ 21 (8th Dist.); R.C. 2901.05(B)(1).

**{¶54}** The Ohio Revised Code defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). "Deadly force," however, is defined as "any force that carries a substantial risk that it will proximately result in the death of any person." R.C. 2901.01(A)(2).

**{¶55}** In a nondeadly-force case, the defendant must produce sufficient evidence tending to support that: (1) he did not create the situation that caused the altercation; (2) he had reasonable grounds to believe, and honestly believed, that he was in imminent danger of bodily harm; and (3) the only way to protect himself from the danger was using force and that he did not use more force than was reasonably necessary to defend himself against the imminent danger of bodily harm. *Id.* at ¶ 21. If the defendant produces such evidence, the state then carries the burden of persuasion to prove the absence of any of these three elements beyond a reasonable doubt. *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 46 (8th Dist.).

**{¶56}** To show self-defense in the use of deadly force, a defendant must show: (1) he was not at fault in creating the situation; (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such a danger was in the use of such force; and (3) he did not violate a duty to retreat or avoid the danger. *State v. Ralls*, 1st Dist. Hamilton No. C-210410,

17

2022-Ohio-2110, ¶ 6.

{¶57} Jordan argues that the evidence was insufficient to convict him on the felonious-assault charges as he showed that he engaged in justifiable self-defense. But a sufficiency-of-the-evidence standard is not the appropriate standard as applied to an affirmative defense, such as self-defense, because it does not challenge the sufficiency of the state's evidence. *State v. Glover*, 1st Dist. Hamilton No. C-180572, 2019-Ohio-5211, ¶ 27-28; *see State v. Dykas*, 185 Ohio App.3d 763, 2010-Ohio-359, 925 N.E.2d 685, 18 (8th Dist.) (explaining that "when reviewing a claim by a defendant that evidence supports his claim of self-defense, the manifest-weight standard is the proper standard of review because a defendant claiming self-defense does not seek to negate an element of the offense charged but rather seeks to relieve himself from culpability"); *State v. Bundy*, 2012-Ohio-3934, 974 N.E.2d 139, (4th Dist.) (concluding that "[w]hether a defendant established an affirmative defense does not relate to whether the state presented sufficient evidence to support the essential elements of the crime charged, but instead, it seeks to relieve the defendant of criminal responsibility."). Therefore, we address the assignment of error under a manifest-weight-of-the-evidence standard. *See Dykas* at ¶ 18; *Bundy* at ¶ 31.

{¶58} In reviewing a challenge to the weight of the evidence, appellate courts act as a thirteenth juror. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). This court must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Buttram*, 1st Dist. Hamilton No. C-190034, 2020-Ohio-2709, ¶ 24. "When evidence is susceptible to more than one construction, a reviewing court must give it the interpretation that is consistent with

18

the judgment." *In re J.C.,* 1st Dist. Hamilton No. C-180493, 2019-Ohio-4027, ¶ 20.

{**¶59**} Jordan argues that he did not start the fight. He asserts that Cutts came into Ballew's house and started choking him. Ballew testified that the men began to fight at the same time, and that both of them had to do something to protect themselves. D.A. testified that he saw Cutts grab Jordan first and saw Cutts's hands around Jordan's throat.

{**¶60**} In his brief, Jordan cites to case law that discusses non-deadly force. But under either analysis, the jury did not clearly lose its way and create a manifest miscarriage of justice by finding that state met its burden of persuasion to show the absence of self-defense. While Jordan may have shown that Cutts started the fight and that he reasonably believed he had to use force to protect himself, the amount of force that he used was not reasonably necessary. Jordan threatened to kill Cutts, who did not have a weapon. Jordan caused Cutts serious, permanent injuries. Cutts suffered five lacerations. His injuries warranted having his spleen removed, leaving him susceptible to illness and disease. Jordan used more force than was necessary when the men were engaged in a fist fight or tussle.

{**¶61**} Jordan's second assignment of error is overruled.

## C. **Weight of the Evidence**

{**¶62**} Jordan's third assignment of error asserts that his convictions were contrary to the weight of the evidence. As discussed above, we do not reverse based on weight of the evidence unless the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Buttram*, 1st Dist. Hamilton No. C-180493, 2020-Ohio-2709, at ¶ 24.

{**¶63**} Reversing a conviction and granting a new trial should only be done in

19

"exceptional cases in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983), paragraph three of the syllabus. "The trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented." *State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16.

{¶64} This is not one of those rare, exceptional cases in which the evidence weighs heavily against conviction. The expert testimony corroborated the eyewitness testimony about the events on the night of the murder. The jury, as the trier of fact, could have believed all, some, or none of the testimony. It chose to believe that Jordan murdered Bradley and that Jordan did not act in self-defense when he stabbed Cutts. The evidence does not weigh heavily against the convictions. The third assignment of error is overruled.

### D. Ineffective Assistance of Counsel

{¶65} Jordan's final assignment of error asserts that his trial counsel was ineffective, which denied him his constitutionally-guaranteed right to counsel. The appropriate remedy for allegations of ineffective assistance of counsel based on facts in the record is an appeal from the verdict. *State v. Mallory*, 8th Dist. Cuyahoga No. 49389, 1985 Ohio App. LEXIS 7256, *2 (Oct. 3, 1985). An appellant must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense, thereby depriving appellant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Debatable trial tactics do not demonstrate deficient performance and "do not constitute a deprivation of the effective assistance of counsel." *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d

1189 (1980). "A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal,* 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

{¶66} Attorneys are presumed competent. *State v. Minton*, 6th Dist. Ottowa Nos. OT-13-030 and OT-13-031, 2014-Ohio-2218, ¶ 13. Reviewing courts must refrain from second-guessing strategic, tactical decisions and strongly presume that counsel's performance falls within a wide range of reasonable legal assistance. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

{¶67} "To warrant reversal, '(t)he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 694.

{¶68} Jordan contends that his counsel was ineffective for failing to engage a crime scene reconstructionist. He asserts that counsel's failure to "put on at least some expert evidence to discredit the state's theory that [Jordan] stabbed and killed Mr. Bradley" was not a reasonable tactical decision.

{¶69} Generally, the failure to call an expert witness does not constitute ineffective assistance of counsel. *State v. Chambers*, 1st Dist. Hamilton Nos. C-060922 and C-061036, 2008-Ohio-470, ¶ 28. Although Jordan's counsel did not hire an expert to conduct an accident reconstruction, counsel thoroughly cross-examined the experts who investigated the scene as to the blood trail's direction and the experts' testimonies that the blood trail was consistent with Bradley being stabbed behind the house where Jordan's vehicle was parked. Counsel further argued that the state's reconstructionist

reached improper conclusions because they conflicted with Criswell's testimony, contending that Bradley was alive and well sitting on his porch as Jordan and Criswell left, and that someone else came to Bradley's house and killed him.

{¶70} Counsel's decision to cross-examine the state's witnesses, rather than to call his own expert, was a matter of trial strategy. *Id.*; *see State v. Patton*, 1st Dist. Hamilton No. C-190694, 2021-Ohio-295 ¶ 30. Because the decision not to present expert testimony may be tactical, the decision of trial counsel to rely on cross-examination of the state's expert does not equate to ineffective assistance of counsel. *Patton* at ¶ 30; *see State v. McRae*, 1st Dist. Hamilton No. C-180669, 2020-Ohio-773, ¶ 19. Further, the testimony that a crime scene reconstructionist may have provided is purely speculative, and Jordan cannot demonstrate that the outcome of the proceedings would have been different but for counsel's failure to hire such an expert. *See Strickland*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989).

{¶71} Likewise, counsel was not ineffective for failing to seek a mistrial following "other acts" testimony. A mistrial must be declared "only when the ends of justice so require and a fair trial is no longer possible." *State v. Durst*, 6th Dist. Huron No. H-18-019, 2020-Ohio-607, ¶ 45, quoting *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

{¶72} A trial court properly denies a motion for a mistrial based on testimony related to "other crimes, wrongs, or acts" under Evid.R. 404(B) when that testimony was brief and isolated, the remarks were followed by a curative instruction, and the likelihood of prejudice is low. *Id.* at ¶ 47. To analyze whether a defendant was deprived of a fair trial, "an appellate court must determine whether, absent the improper

22

remarks, the jury would have found the appellant guilty beyond a reasonable doubt." *Id.*, quoting *City of Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, 933 N.E.2d 317, ¶ 42 (10th Dist.).

{¶73} The "other acts" were Criswell's testimony involving Jordan's alleged history of domestic violence toward Criswell. When testifying about Jordan calling her and telling her not to speak to the police, she stated:

Q: Did you tell Detective Sieving you were afraid of Stanley Jordan?

A: Yes.

Q. Why were you afraid of Stanley Jordan?

A. Because of, just history of us.

Q. And what were you afraid of?

Defense counsel: Objection. * * * Going into any history. That's not admissible.

{¶74} Following the objection, the court took a break, during which counsel discussed the issue with the court. The court instructed the state to elicit information about Jordan's alleged intimidation involving Criswell speaking to the police in a more pointed way.

{¶75} When the jury returned, the state asked,

Q: Ms. Criswell, before the break we were talking about the phone calls the defendant made to you the week after you spent the evening with [Bradley]. Is it fair to say those phone calls made you afraid?

A: Yes.

{¶76} Criswell provided no testimony about any history of domestic violence between her and Jordan. At most, the jury heard a vague suggestion about their

23

"history." This does not rise to the level necessary to find that counsel was ineffective for failing to seek a mistrial because absent this brief, isolated reference to their "history," it is unlikely that the result would have been different.

{¶77}  Jordan's fourth assignment of error is overruled.

### III.  Conclusion

{¶78}  Based on the foregoing reasons, we overrule all of Jordan's assignments of error and affirm the trial court's judgment.

Judgment affirmed.

ZAYAS, P.J., and CROUSE, J., concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.